UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TONY DARNELL BROWN,

                    Petitioner,

                                              CASE NO. 05-72843

v.

                                              PAUL D. BORMAN
BLAINE C. LAFLER,                             UNITED STATES DISTRICT JUDGE

                    Respondent.
_____/

**OPINION AND ORDER
DENYING THE AMENDED HABEAS CORPUS PETITION (Dkt. #41) AND
DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, BUT
GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

This matter is pending before the Court on petitioner Tony Darnell Brown's *pro se* amended habeas corpus petition challenging his Oakland County conviction for assault with intent to commit murder. Petitioner alleges that his trial and appellate attorneys were ineffective, that the trial court erred by failing to instruct the jury on felonious assault and by excluding Petitioner's hearsay testimony, that the prosecutor pierced the veil of the attorney-client relationship, and that the cumulative effect of errors deprived him of a fair trial. Respondent Blaine C. Lafler argues in an answer to the amended petition that Petitioner's claims lack merit and are barred by the statute of limitations and the doctrine of procedural default. Having read the pleadings and record, the Court agrees with the state court that Petitioner's claims lack merit. Accordingly, the amended habeas corpus petition will be denied. A procedural history and analysis follow.

# I.  Background

## A.  The Facts, Verdict, and Sentence

Petitioner was charged with assault with intent to commit murder, Mich. Comp. Laws §
750.83. The charge arose from the beating of eighteen-year-old Jeffrey Carnes in the town of
Holly, Michigan on December 31, 2001.  Petitioner was tried before a jury in Oakland County
Circuit Court in Pontiac, Michigan, where a civilian named Brent Herb testified that, as he drove
through downtown Holly on December 31, 2001, between 9:00 and 10:00 p.m., he saw a man in
the parking lot of a business called Muffler Man.  The man fell, got up, staggered, and then fell
again.  The man's face was covered with blood.  Mr. Herb kept going, but called the 911
operator, and when he passed through the area about fifteen minutes later, an ambulance had
already left with the victim.

Dominique Taylor testified that, on December 31, 2001, she was in Holly, Michigan
visiting her sister Ash'lee, who was dating the defendant, Tony Brown.  Dominique learned that
some items had been taken from her mother's home, and she suspected that Jeff Carnes may
have been involved in the theft.  About 9:00 p.m. on December 31, 2001, Dominique saw Nicole
Contreras, who said she was planning to meet Jeff Carnes at the BP gas station on Saginaw
Street in Holly.  When the defendant and his brother Harold Brown arrived at the Taylor
residence, the group talked about Jeff  Carnes and the girls' desire to confront Jeff with their
suspicion that he had broken into their mother's home.  They decided that they would take
Nicole to meet Jeff and, at some point, they would confront Jeff with the incident at their
mother's place.

Dominique, her sister Ash'lee, the defendant, and Harold Brown subsequently took Nicole to the BP gas station. They watched as Nicole got out of the car, met Jeff Carnes, and walked with Jeff toward the Muffler Man. The defendant then got out of the car and walked past Nicole and Jeff from the opposite direction. The defendant subsequently turned around and walked back toward the parking lot of the Muffler Man.

Continuing, Dominique stated that she and her sister got out of the car after the defendant did. She called Jeff's name. Jeff and Nicole then stopped by the parking lot of the Muffler Man. She did not notice any weapons on Jeff, but he was carrying a plastic soda pop bottle in one hand, and his other hand was inside his "hoody." She mentioned to Jeff that she thought he had broken into her mother's home. Jeff responded that he did not do it. The defendant then walked up and said to Jeff, "Are you calling my girlfriend and her sister a liar?" Jeff replied, "Obviously I am."

At some point, the group decided to leave the area, but Jeff raised his hand with the bottle, and the defendant pulled a baseball bat out of his jacket. The defendant whirled the bat around in front of himself and said to Jeff, "Are you going to cry like a little bitch now?" The defendant then hit the right side of Jeff's head with the baseball bat. Jeff tumbled and fell to the ground. As Jeff lay on the ground, the defendant hit him in the stomach with the bat. The defendant hit Jeff a total of four or five times while Jeff laid on the ground. Jeff did not hit or kick the defendant; instead, he was lying in the fetal position, trying to protect his stomach. She (Dominique) was in shock and did not tell the defendant to stop hitting Jeff, but her sister did. The defendant then hit Jeff one more time. As they left, Jeff had one hand in the air; it was full of blood.

3

Everyone but Jeff went back to the car, where the defendant admitted that he had hit Jeff hard.  But neither the defendant, nor Nicole Contreras wanted to go back and check on Jeff.  They were scared, and the defendant said that he did not want to get caught.  They went back to the Taylor home and then to church, but they did not call the police or tell anyone what had happened.

Nicole Contreras testified that she was Jeff Carnes' friend and that she made plans to meet Jeff at the BP gas station in Holly about 9:00 p.m. on December 31, 2001.  Dominique, Ash'lee, Harold Brown, and the defendant dropped her off at the BP.  After she started walking, she saw Jeff.  Jeff had a plastic bottle of red pop in his hand, but she did not see any weapons on him.  They subsequently saw the defendant walking on the same side of the street, but in the opposite direction.  The defendant stared at them in a rude manner.  Then she heard Dominique Taylor call to Jeff.  So, they walked back to her.  Dominique asked Jeff whether he knew anything about the robbery at her mother's house, but Jeff said that he was working that day and did not know about the robbery.  Ash'lee Taylor and the defendant walked up and joined them in the conversation, and the defendant said to Jeff, "What, are you calling my girlfriend a liar?"  The defendant also called Jeff a wimp and asked him whether he was scared.  The defendant then pulled a wooden baseball bat from under his coat and swung it around in front of him.  Jeff looked a little scared, but he just stood there.

Nicole further testified that she became frightened when she saw the bat.  She started to walk away, but then heard a loud crack and turned around.  She saw Jeff fall to the ground.  The defendant was the closest person to Jeff at the time, and he still had the baseball bat in his hand.  Jeff had one hand on his head and one hand on his chest.  She saw the defendant hit Jeff pretty

4

hard with the baseball bat a few times while Jeff laid on the ground. At least one of those times, the defendant hit Jeff on the head with the bat. She thought that the defendant also kicked Jeff a few times. The group got back in the car and left Jeff on the ground, even though he was bleeding. Petitioner later said that Jeff got beat pretty badly. It sounded like he was boasting a little bit when he said that. She did not see Jeff with a weapon that night, and he did not hit the defendant, kick the defendant, or pull out an object or weapon of any kind.

Matthew Weil testified that he was in charge of emergency medical services for the North Oakland County Fire Authority. On December 31, 2001, he was dispatched at 9:46 p.m. to Saginaw Street near Airport Road in Holly. When he arrived at the scene, he saw a young man lying on the ground and bleeding from the nose, mouth, back of head, left ear, and over his left eye. His injuries were severe to life threatening. They transported the man to the trauma center of a hospital.

Dr. Mokbel Chedid testified that he practiced neurological surgery and that he was called to the emergency room on December 31, 2001, to treat Jeffrey Carnes, whose chance of surviving was less than ten percent. Jeff had a fracture over his left eye which extended to his nose. He also had ear and chest injuries, linear fractures along the side of his brain and back of the head, and significant injury to the brain. Jeff was unconscious for a number of days and remained in the hospital for a while before entering the rehab unit. His injuries were consistent with being hit with a baseball bat three or more times. As of the day of trial, Jeff continued to suffer from his injuries. His IQ was low, and his memory, concentration, and motivation were poor.

5

Kathryn Carnes testified that she was Jeffrey Carnes' stepmother and had known Jeff for about three and a half years.  She stated that, before the beating, Jeff was a typical 17- or 18-year-old young man, and, after the beating, he required constant care.  Jeff was in a coma for about ten days and in the hospital until February.  He was anticipating additional surgeries as of the date of trial.  The criminal incident affected his memory and his level of intelligence, and although he improved with time, he had to re-learn how to walk, talk, and use a spoon.  He communicated best with her nine-year-old son.

Oakland County Deputy Sheriff Charlton testified that his job was to collect, preserve, and document evidence at the crime scene.  He collected a partially full twenty-ounce bottle of red soda pop, and a detective delivered a baseball bat to his laboratory a couple days after the crime.  He identified one of Petitioner's fingerprints on the baseball bat, and he found a closed, folding knife in the pocket of Jeff's jacket.

Scott Fischer was a detective for the Village of Holly Police Department.  He testified that he was called to assist with the investigation of the crime and found a wooden baseball bat in a snow bank on the edge of the parking lot at the Muffler Man.  He found nothing in the pockets of the victim's hooded sweatshirt.

After speaking with Nicole Contreras, Detective Fischer got a lead on a possible suspect. He then went to the defendant's home where he talked with Fred Crawford, the defendant's father.  The defendant was not home, but Mr. Crawford led Detective Fischer to his car where he believed the baseball bat in question was located.  The bat was not there.  Later that afternoon, Mr. Crawford brought the defendant to the police station for questioning.  Petitioner and Mr. Crawford were very cooperative, and they did not ask for an attorney.  Following the interview,

6

Detective Fischer obtained a warrant for the defendant's arrest.

Petitioner and Mr. Crawford were the only defense witnesses. Mr. Crawford testified that, about 11:00 p.m. on December 31, 2001, his son went to pick up Nicole, Ash'lee, and Dominique. They went to church after his son returned home with the three young ladies.

Mr. Crawford explained that he carried a bat in his car because he was a former postal carrier and he needed a bat for protection from dogs on his rural route. On the day that Detective Fischer came to visit him, they went to his car and looked for the bat, but they did not see it. He claimed that the bat had been in the family for ten or twenty years, but that it had been broken for ten years and was not good for anything.

Continuing, Mr. Crawford stated that, when he and his son went to see Detective Fischer, his son gave his side of the story. They did not request an attorney, and they went home after his son made his statement. Some days later, Detective Fischer called and asked him to bring his son to the police department. He then turned his son over to Detective Fischer. Mr. Crawford also testified that he did not know Jeff Carnes and that there were no problems between the two families.

Petitioner testified that Ash'lee Taylor was his girlfriend and that, on December 31, 2001, he and his brother Harold went to pick up Ash'lee, Dominique, and Nicole because they were planning to go to church that night. They were using his father's car, and when they arrived at Ash'lee's house, he was asked to drop off Nicole at the BP gas station so that she could meet Jeff Carnes. After they dropped off Nicole, he went to check on her to see if she was alright, because he did not want her walking in the dark by herself. He got out of the car and walked past Nicole and Jeff Carnes. Dominique and Ash'lee also got out of the car, and he heard them call Jeff's

7

name.  Nicole, Ash'lee, and Dominique argued with Jeff and accused him of breaking into their apartment.  He (Petitioner) also asked Jeff about the break-in.  He had a bat in his coat because he was scared and did not know whether Jeff carried a weapon.  Jeff was holding a bottle, and his other hand was in one of his pockets.  When Jeff raised his hand at him, he swung the bat at Jeff, who stumbled backward and fell, but started to get back up.  He hit Jeff again because he could not see where Jeff's hands were.

Petitioner admitted to the jury that he hit Jeff on the side of his face the first time.  He could not remember where he hit him the second time, and he denied hitting him more than two times.  He claimed that after the incident, they picked up his father and went to church.  After mass, he went home and called the hospital to check on Jeff's condition because he knew he hurt him pretty bad.  The next day he went to his sister's house in Taylor.  His father picked him up and took him to Holly to see Detective Fischer where he told his side of the story.

Petitioner denied kicking Jeff, and he said that his intent had been to defend himself, not to kill Jeff.  On cross-examination, however, he admitted that Jeff never laid a finger on him and had not harmed him.  He also admitted that he had approached Jeff with the baseball bat hidden in his coat and that he could have walked away from him, but chose not to.

During closing arguments, the prosecutor argued that Petitioner had been the aggressor and that Petitioner's version of the facts was inconsistent with what the other witnesses said about the number of blows and what the victim was doing.  Defense counsel argued to the jurors that they should acquit Petitioner because Petitioner did not intend to murder the victim and because he acted in self defense when the victim raised his hand at him.

The trial court instructed the jury on the charged offense of assault with intent to commit murder and on the lesser-included offense of assault with intent to do great bodily harm less than murder.  The jurors deliberated a little more than two and a half days, and on July 24, 2002, they found Petitioner guilty, as charged, of assault with intent to commit murder.  On September 4, 2002, the trial court sentenced Petitioner at the age of eighteen to imprisonment for fifteen to fifty years.

**B.  The Direct Appeal and First Habeas Corpus Petition**

On direct appeal from his conviction, Petitioner argued that:  his trial attorney was ineffective for failing to object to the prosecutor's rebuttal argument; the trial court deprived him of due process by repeating his testimony to the jury out of context; and his sentence was illegal because the trial court failed to properly score the sentencing guidelines.  The Michigan Court of Appeals disagreed with Petitioner's arguments and affirmed his conviction in an unpublished, *per curiam* opinion.  *See People v. Brown*, No. 243961, 2004 WL 345424 (Mich. Ct. App. Feb. 24, 2004).  On August 31, 2004, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  *See People v. Brown*, 471 Mich. 872 (2004) (table).

Petitioner subsequently filed a habeas corpus petition in this Court, raising the same claims that he presented to the state courts on direct review.  After Respondent filed an answer to the habeas petition, Petitioner moved for a stay so that he could pursue additional state court remedies.  On August 31, 2007, the Court granted Petitioner's motion for a stay and closed this case for statistical purposes.  *See* Dkt. #24.  At Petitioner's request, the Court subsequently dismissed the case without prejudice.  *See* Dkt. #32.

9

**C.  State Collateral Review**

On May 27, 2009, Petitioner filed a motion for relief from judgment in Oakland County Circuit Court.  He argued that his trial and appellate counsel were ineffective, that the trial court erred by failing to instruct the jury on felonious assault and by precluding him from offering hearsay testimony regarding his state of mind, that the prosecutor committed misconduct, and that the cumulative effect of trial errors deprived him of due process and a fair trial.  The trial court's successor found no error in her predecessor's rulings or in the prosecutor's actions, and she determined that neither trial counsel, nor appellate counsel, was ineffective.  The trial court concluded on the basis of Michigan Court Rule 6.508(D)(3) that Petitioner had failed to demonstrate "good cause" for his failure to raise his issues on appeal and "actual prejudice" from the alleged irregularities.  Accordingly, the trial court denied Petitioner's motion for relief from judgment.

Petitioner appealed the trial court's decision, but the Michigan Court of Appeals denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Brown*, No. 295563 (Mich. Ct. App. Apr. 28, 2010).  On March 8, 2011, the Michigan Supreme Court denied leave to appeal for the same reason.  *See People v. Brown*, 488 Mich. 1045 (2011) (table).

**D.  The Amended Petition and Response**

In 2011, Petitioner returned to this Court and filed a motion for relief from judgment with an amended habeas corpus petition and brief attached to the motion.  He raised the six claims that he presented to the state court on collateral review of his conviction.  The Court then re-opened this case, and Respondent filed an answer to the amended petition.

10

Respondent asserts that Petitioner's claims are barred by the one-year statute of limitations, *see* 28 U.S.C. § 2244(d), and by the doctrine of procedural default. A procedural default "is not a jurisdictional matter." *Trest v. Cain*, 522 U.S. 87, 89 (1997). Nor is AEDPA's statute-of-limitations defense "jurisdictional." *Day v. McDonough*, 547 U.S. 198, 205 (2006). Furthermore, a determination of whether Petitioner's claims are time-barred or procedurally defaulted "adds nothing but complexity to the case." *Babick v. Berghuis*, 620 F.3d 571, 576 (6th Cir. 2010). The Court therefore "cut[s] to the merits here," *id.*, using the following standard of review.

## II.  Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, the Court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle

11

from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part II). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)." *Renico v. Lett*, 559 U.S. 766, 773 (2010). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 786 (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87.

### III. Discussion

#### A. Trial Counsel

The Court begins its discussion with Petitioner's claim about trial counsel. Petitioner alleges that his attorney was ineffective for failing to (1) question Petitioner about his confession and move to suppress the confession, (2) investigate why two accomplices were not charged with

the crime, (3) argue a defense of imperfect self defense, and (4) call two or more people as character witnesses.  The only state court to address this claim in a reasoned opinion was the trial court's successor, who opined on state collateral review that Petitioner's claim of ineffective assistance of trial counsel lacked merit.

To prevail on his claim, Petitioner must show that his attorney's "performance was deficient" and "that the deficient performance prejudiced the defense."  *Strickland v. Washington*,  466 U.S. 668, 687 (1984).  The "deficient performance" prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id*. at 689.

The "prejudice" prong of the *Strickland* test "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id*. at 687.  Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable."  *Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693).

### 1.  Petitioner's Confession

Petitioner alleges that his attorney should have questioned him about the circumstances of his statement to the police and moved to suppress the statement. Petitioner argues that evidence of his confession enabled the prosecutor to (1) discredit him by asking him about things he left out of his statement and (2) bolster the credibility of the officer in charge of the case.

13

The record indicates that Petitioner and his father went to Detective Scott Fischer's office at the Holly Police Department because Detective Fischer had expressed an interest in talking with Petitioner.  The interview lasted about forty-five minutes.  During that time, Petitioner gave his side of the story.  Neither Petitioner, nor his father requested an attorney, and both of them were very cooperative.  After the interview, Petitioner was permitted to go home with his father. (Trial Tr. Vol. II,  130-32, 147-48, 170-71, July 18, 2002).

At trial, both Petitioner and his father testified that Detective Fischer had treated them well during the interview (*id*. at 152; Trial Tr. Vol. III, 18, July 19, 2002), and Petitioner testified that he told the truth during the interview (Trial Tr. Vol. II, 171, July 18, 2002).  Petitioner also testified that Detective Fischer did not threaten him and that Fischer had been a gentleman to him and allowed him to make a full statement.   (Trial Tr. Vol. III, 18, July 19, 2002).

There is no basis for concluding from the record, as summarized in the preceding paragraphs, that Petitioner's statement to Detective Fisher was involuntary, coerced, or otherwise improper.  Further, the content of Petitioner's alleged confession was not revealed to the jury, and he has not alleged any legal basis for suppressing his statement.  The Court therefore finds that defense counsel's failure to question Petitioner about his interview with Detective Fischer and counsel's failure to move to suppress evidence of the statement did not amount to ineffective assistance.  A motion to suppress any reference to Petitioner's statement in all likelihood would not have succeeded, and "failing to make a futile motion is neither unreasonable nor prejudicial." *Jacobs v. Sherman,* 301 F. App'x 463, 470 (6th Cir. 2008) (citing *Strickland*, 466 U.S. at 687).

14

### 2.  The Alleged Accomplices

Petitioner asserts next that his attorney should have investigated why Dominique Taylor and Nicole Contreras were not charged as accomplices to the crime.  Petitioner also contends that trial counsel should have investigated whether the accomplices were offered immunity for their testimony.  According to Petitioner, the lack of information about these accomplices deprived the jury of an opportunity to honestly and candidly evaluate whether the witnesses' testimony was reliable and trustworthy.

The trial court stated at sentencing that it thought the three young women who were witnesses to the crime should be standing before the court with Petitioner because they participated in benign encouragement of Petitioner's wrongful acts.  The court said that the young women had a moral, if not legal, duty to stop Petitioner and to help Jeffrey Carnes after the beating.  (Sentencing Tr., 15-16, Sept. 4, 2002).

The record indicates that Detective Fischer did interview Nicole Contreras, Ash'lee Taylor, and Dominique Taylor (Trial Tr. Vol. II, 127-28, July 18, 2002), and the decision whether to prosecute and what charge to file ordinarily rests entirely in the prosecutor's discretion.  *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).  The record also indicates that neither Dominique Taylor, nor Nicole Contreras, participated in the actual assault on Jeffrey Carnes.  Dominique testified that she or her sister or both of them informed Petitioner that they were planning on confronting Jeff Carnes about breaking into their mother's home.  (Trial Tr. Vol. I, 140-42, July 16, 2002.)[1]  But there is no evidence that Dominique planned or participated

---

[1]  At a later point in the trial, Dominique testified that she did not personally inform Petitioner of her intentions to confront Jeff Carnes.  (Trial Tr. Vol. I, 158-59, July 16, 2002.)

15

in the subsequent assault on Jeff Carnes.  In fact, she testified that she did not know Petitioner had a baseball bat inside his coat.  (*Id*. at 164.)  She also testified that one reason she got out of the car in the Muffler Man parking lot was because she did not want Petitioner to get into a fight with Jeff, who was drunk.  (*Id*. at 160-62.)  And before Petitioner hit Jeff, she had said to Petitioner, "Let's go; let's get out of here."  (*Id*. at 146, 151.)  She claimed that she did not tell Petitioner to stop hitting Jeff during the assault because she was in shock.  (*Id*. at 135.)

Nicole Contreras testified that there was no plan as to what was going to happen the night of the crime, and that she was a little surprised when she saw Petitioner walk by her and Jeff after she met Jeff at the BP gas station.  (*Id*. at 189, 191.)  She claimed that she did not try to stop Petitioner from hitting Jeff because she and Petitioner were "barely friends" and she was afraid he might hurt her.  She did not call for help after the incident because she was scared of Dominique, Ash'lee, and Petitioner.  (*Id*. at 206-09.)

In light of the facts summarized above, defense counsel was not ineffective for failing to investigate whether Dominique Taylor and Nicole Contreras were accomplices to the crime or given immunity for their testimony.

### 3.  The Defense Theory

Petitioner maintains that his attorney should have argued a defense of imperfect self defense and defense of others.  According to Petitioner, the evidence demonstrated that he armed himself with a baseball bat to protect himself and the young women who accompanied him on December 31, 2001.

The doctrine of imperfect self defense "mitigates criminal liability for a homicide from murder to voluntary manslaughter when a defendant acts as the initial aggressor and then claims

16

that the victim's response necessitated the use of force." *People v. Reese*, 491 Mich. 127, 129 (2012).[2]  The rule does not apply where there is no murder and the defendant maintains that the victim was the initial aggressor.  *People v. Wytcherly*, 172 Mich. App. 213, 221 (1988).

There was no murder in this case, and Petitioner insinuated that the victim was the aggressor, claiming that he hit the victim when the victim raised his hand with the bottle.  (Trial Tr. Vol. II, 167, July 18, 2002; Trial Tr. Vol. III, 12-14, July 19, 2002.)  Thus, the doctrine of imperfect self-defense was not applicable, and defense counsel was not ineffective for failing to raise the defense.

Furthermore, any theory of self defense, imperfect or otherwise, was questionable because Dominique Taylor testified that Jeff Carnes did not hit Petitioner and he did not reach in his pocket while he was on the ground.  (Trial Tr. Vol. I, 163-65, July 16, 2002.)  Petitioner himself admitted at trial that Jeff Carnes did not touch him, either on the day in question or at any other time.  (Trial Tr. Vol. III, 19, July 19, 2002).  Petitioner also admitted that he could have walked away from Jeff.  (*Id*. at 22.)  Petitioner further admitted that Jeff was unable to protect himself from Petitioner's first blow because one of Jeff's hands was in his pocket, and he could not defend against the subsequent blows because he never got completely up from the ground after the first blow.  (*Id*. at 10, 19-23.)  The Court concludes for all these reasons that defense counsel was not ineffective for failing to argue a theory of imperfect self defense.

The facts also did not justify the theory that Petitioner acted in defense of others. Dominique Taylor testified that Jeff Carnes did not do anything physical to her and did not hit

---

[2]  Long after Petitioner's trial, the Michigan Supreme Court held in *Reese* that the doctrine "does not exist in Michigan law as a freestanding defense mitigating murder to voluntary manslaughter."  *Reese*, 491 Mich. at 129.

her or her sister in the parking lot.  (Trial Tr. Vol. I, 159, July 16, 2002.)  And Petitioner testified

that Jeff did not do anything to Nicole or Ash'lee as they were standing in the parking lot.  (Trial

Tr. Vol. III, 19, July 19, 2002.)  Therefore, defense counsel was not ineffective for failing to

argue that Petitioner acted in defense of others.

### 4.  Failure to Call Specific Witnesses

Petitioner's final claim about his trial attorney is that the attorney failed to call Ash'lee

Taylor, Harold Brown, and Candance Taylor as witnesses.  Ash'lee Taylor was Dominique

Taylor's sister, and Candance Taylor was Ash'lee and Dominique's mother.  Harold Brown was

Petitioner's brother.  Petitioner claims that defense counsel did not interview any of these

witnesses to ascertain whether they could enhance his defense, buttress his testimony, or offer

proof of the victim's bad character.

Defense attorneys have "a duty to make reasonable investigations or to make a

reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at

691.  The duty to investigate "includes the obligation to investigate all witnesses who may have

information concerning his or her client's guilt or innocence."  *Towns v. Smith*, 395 F.3d 251,

258 (6th Cir. 2005); *see also Jackson v. Bradshaw*, 681 F.3d 753, 762 (6th Cir. 2012) (stating

that "[t]rial counsel renders ineffective assistance when he 'fails adequately to investigate, and to

introduce into evidence, information that demonstrates his client's factual innocence, or that

raises sufficient doubts as to that question to undermine confidence in the verdict' ") (quoting

*Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) (quoting *Reynoso v. Giurbino*, 462 F.3d

1099, 1112 (9th Cir. 2006)), *cert. denied*, __ U.S. __, 133 S. Ct. 983 (2013).  Failure to conduct

a reasonable investigation of a known and potentially important witness violates a defendant's

18

Sixth Amendment right to the effective assistance of counsel. *Towns v. Smith*, 385 F.3d at 259. But a defense attorney " 'has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant.' " *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004) (quoting *Millender v. Adams*, 187 F.Supp.2d 852, 877 (E.D. Mich. 2002)).

Petitioner has not alleged what his brother or Candance Taylor would have said if they testified. Nor has he shown that they were willing and able to testify. Although he says that Ash'lee Taylor might have testified differently from her sister Dominique, that is mere speculation. And even though he implies that Ash'lee could have testified that the victim carried a weapon and had a propensity for violence and selling drugs, the eyewitnesses who did testify said that they did not see a weapon on the victim. (Trial Tr. Vol. I, 127, 131, July 16, 2002 (Dominique Taylor's testimony) and *id*. at 170, 179 (Nicole Contreras' testimony)). Nor did they see the victim touch, hit, or kick Petitioner. (*Id*. at 133, 179.) Even Petitioner conceded that all he noticed was a bottle in the victim's hand. (Trial Tr. Vol. II, 166, July 18, 2002.) And the only weapon found on the victim was a closed, folding knife in the pocket of his jacket. (*Id*. at 86.) The Court therefore concludes that defense counsel was not ineffective for failing to interview or call Ash'lee Taylor, Candance Taylor, or Harold Brown as witnesses.

In conclusion, the Court finds that defense counsel's performance was not deficient and that the allegedly deficient performance did not prejudice the defense. Therefore, the state court's finding that trial counsel was not ineffective was objectively reasonable.

## B. The Jury Instructions

Petitioner contends that the trial court erred reversibly when it failed to instruct the jury

19

on felonious assault as a lesser offense to assault with intent to commit murder.[3]  Defense

counsel requested a jury instruction on felonious assault, but the trial court denied the request,

saying that it was a case of either assault with intent commit murder or assault with intent to do

great bodily harm less than murder.  (Trial Tr., Vol. III, 6-8, July 19, 2002.)

Petitioner alleges that the evidence justified a jury instruction on felonious assault

because there was evidence that he feared the victim, that the victim was known to carry

weapons, and that he lacked the intent to kill the victim.  Petitioner further alleges that the lack

of a jury instruction on felonious assault limited his ability to establish a theory of self defense

and infringed on the jury's role as trier of fact.  Finally, Petitioner claims that the error was not

harmless, because the deliberating jurors asked whether there were any circumstances that would

reduce or excuse the crime to a lesser offense.  The trial court's successor considered this issue

and found no error in her predecessor's ruling.

The United States Supreme Court has not determined whether the failure to give jury

instructions on lesser-included offenses in non-capital cases such as this one violates the right to

due process.  *See Beck v. Alabama*, 447 U.S. 625, 638 n.14 (1980) (stating that "[w]e need not

and do not decide whether the Due Process Clause would require the giving of such instructions

in a noncapital case").  Thus, the "failure to instruct on a lesser included offense in a noncapital

---

[3]  "The elements of assault with intent to commit murder are (1) an assault, (2) with the specific intent to commit murder, (3) which, if successful, would make the killing murder." *People v. Beard*, 171 Mich. App. 538, 541 (1988).  In contrast, "[t]he elements of felonious assault are (1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery."  *People v. Avant*, 235 Mich. App. 499, 505 (1999).

case is not 'such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure.'" *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002) (quoting *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (*en banc*)).

Even if there were a due process right to jury instructions on lesser offenses in non-capital cases, Petitioner was not entitled to an instruction on felonious assault because felonious assault is a cognate lesser offense, not a necessarily included lesser offense, of assault with intent to commit murder. *People v. Otterbridge*, 477 Mich. 875, 875 (2006). "Cognate offenses share several elements and are of the same class or category as the greater offense, but contain elements not found in the greater offense." *People v. Wilder*, 485 Mich. 35, 41 (2010). Consequently, a "trier of fact may not find a defendant not guilty of a charged offense but guilty of a cognate offense because the defendant would not have had notice of all the elements of the offense that he or she was required to defend against." *Id*.

Furthermore, the trial court instructed the jury on assault with intent to do great bodily harm less than murder, which is a lesser offense than assault with intent to commit murder. The jury chose not to convict Petitioner of assault with intent to do great bodily harm less than murder. This suggests that the failure to instruct the jury on the lesser offense of felonious assault was harmless error, because the jury was given the option of convicting Petitioner of a lesser offense and declined to do so. *Abdus-Samad v. Bell*, 420 F.3d 614, 628 (6th Cir. 2005). In other words, because the jury chose to convict Petitioner of assault with intent to commit murder, rather than the lesser offense of assault with intent to do great bodily harm less than murder, there is no basis to believe that the jury would have opted to convict Petitioner of the

21

lesser offense of felonious assault over assault with intent to commit murder.  *See id.*  Thus,

habeas relief is not warranted on Petitioner's claim that the trial court should have instructed the

jury on felonious assault.

## C.  Excluded Evidence

Petitioner contends that the trial court deprived him of due process and his right to

present a defense by precluding him from testifying that the young women had told him the

victim carried a weapon.  Petitioner points out that, under state law, an out-of-court statement

may be offered to show the effect of a statement on the hearer because the statement is not

offered to prove the truth of the matter.  *People v. Lee*, 391 Mich. 618, 642 (1974); *People v.*

*Eggleston*, 148 Mich. App. 494, 502 (1986).  Petitioner claims that the trial court's ruling

prevented him from explaining his state of mind (apprehension and fear of the victim) and his

reason for possessing a baseball bat.  The trial court's successor was the only state court to

address this claim in a reasoned opinion, and she found no error in her predecessor's rulings.

### 1.  Clearly Established Law

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present

a complete defense,'" but the Supreme Court has "never questioned the power of States to

exclude evidence through the application of evidentiary rules that themselves serve the interests

of fairness and reliability – even if the defendant would prefer to see that evidence admitted."

*Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479,

485 (1984), and citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).  Although the

Constitution

> prohibits the exclusion of defense evidence under rules that serve no legitimate
> purpose or that are disproportionate to the ends that they are asserted to promote,

22

> well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. . . . [T]he Constitution permits judges to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.

*Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006) (quotation marks and citations omitted) (end bracket in original). "This court's duty 'is not to determine whether the exclusion of the evidence by the trial judge was correct or incorrect under state law, but rather whether such exclusion rendered petitioner's trial so fundamentally unfair as to constitute a denial of federal constitutional rights.' " *Lewis v. Wilkinson*, 307 F.3d 413, 420 (6th Cir. 2002) (quoting *Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir. 1982)).

### 2. Application

Petitioner's claim arose when he was testifying on direct examination about why he had a baseball bat under his coat when he approached the victim on December 31, 2001. He stated that he possessed the bat because he was scared and did not know whether the victim had a weapon. When defense counsel subsequently asked Petitioner why he was scared, he answered, "Because Ash'lee, like, they had told me, like . . . ." At that point, the prosecutor objected to what someone else may have told Petitioner. The trial court sustained the objection. Petitioner nevertheless went on to say, "[T]hey spoke to me. Well, that he might have carried something." The prosecutor objected again on the basis that Petitioner's comment was hearsay. The trial court sustained the prosecutor's objection even though defense counsel argued that Petitioner's statement was relevant to his state of mind at the time. (Trial Tr. Vol. II, 164-65, July 18, 2002.)

Whether the trial court's ruling violated the Michigan Rules of Evidence is not a basis for habeas corpus relief, because "such errors are not cognizable on federal habeas review." *Hall v.*

23

*Vasbinder*, 563 F.3d 222, 239 (6th Cir. 2009). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241; *Rose v. Hodges,* 423 U.S. 19, 21 (1975) (*per curiam*)).

The constitutional question here is whether Petitioner's right to defend himself was violated by the exclusion of testimony concerning what other people had told Petitioner about the victim. In *Chambers v. Mississippi*, 410 U.S. at 302-03, the Supreme Court held that the exclusion of critical evidence, coupled with a rule that prohibited the defendant from cross-examining a person who had confessed to the crime for which Chambers was on trial, deprived the defendant of a fair trial where the hearsay testimony bore persuasive assurances of trustworthiness.

The evidence at issue in *Chambers* "was highly relevant and strongly exculpatory because another person had allegedly admitted to committing the crime for which Chambers was found guilty." *Washington v. Renico*, 455 F.3d 722, 735 (6th Cir. 2006). The evidence in question here went to Petitioner's state of mind and whether his conduct was based on a legitimate fear of the victim. It was not as highly relevant or strongly exculpatory as the confessions in *Chambers* because Petitioner admitted that he twice struck the victim with a baseball bat.

Moreover, Petitioner's attempt to elicit what other people had said about the victim carrying a weapon did not bear persuasive assurances of trustworthiness or indicia of reliability. Although the police found a pocket knife on the victim, it was folded and tucked in his pocket. Both Dominique Taylor and Nicole Contreras testified that they did not see a weapon on the

victim.  The only thing that they and Petitioner saw was the soda pop bottle that the victim was

holding in one hand.  Furthermore, Petitioner was permitted to testify that:  he possessed the bat

and hit the victim because he was scared and did not know whether the victim carried a weapon

(Trial Tr. Vol. II, 165, 171, July 18, 2002; Trial Tr. Vol. III, 11, 22, 26 July 19, 2002); he could

not see where the victim's hand was after the first blow and he did not know whether the victim

was coming at him when he started to get up (Trial Tr. Vol. III, 22-23, July 19, 2002); and his

intent had been to defend himself (Trial Tr. Vol. II, 173, July 18, 2002; Trial Tr. Vol. III, 12,

July 19, 2002).

The Court concludes that the trial court did not deprive Petitioner of his right to present a

defense by precluding him from testifying about what someone had told him.  Petitioner

therefore has no right to habeas relief on the basis of his fourth claim.

## D.  The Prosecutor

Petitioner contends that the prosecutor interfered with the attorney-client privilege when

he asked Petitioner on cross-examination about speaking with his attorney during an overnight

break in the trial.  According to Petitioner, the prosecutor insinuated through his questions that

Petitioner orchestrated his testimony and fabricated his defense after visiting with his attorney.

The trial court's successor was the only state court to address this claim on the merits, and she

found no error in the prosecutor's actions.

### 1.  Clearly Established Federal Law

Although prosecutors "may strike hard blows," they are "not at liberty to strike foul ones.

It is as much [their] duty to refrain from improper methods calculated to produce a wrongful

conviction as it is to use every legitimate means to bring about a just one."  *Berger v. United*

*States*, 295 U.S. 78, 88 (1935), *overruled on other grounds by Stirone v. United States*, 361 U.S. 212 (1960).  But "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review," *Millender v. Adams*, 376 F.3d at 528, and "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context . . . ."  *United States v. Young*, 470 U.S. 1, 11 (1985).  "The relevant question is whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' "  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

### 2.  Application

Petitioner testified at the end of the second day of trial (July 18, 2002) and at the beginning of the third day of trial (July 19, 2002).  On the morning of the third day of trial, the prosecutor asked Petitioner on cross-examination whether he had spoken with his attorney during the previous night.  Petitioner responded by admitting that his attorney had visited him.  The prosecutor then asked Petitioner how many other witnesses had talked to an attorney in the middle of their testimony.  When defense counsel objected, the prosecutor stated that he was withdrawing the question because it was argumentative, but the prosecutor then asked Petitioner once again whether he had talked with his attorney during the previous night.  Petitioner responded that he had asked his attorney how he thought it was going, but that they had not discussed the facts.  (Trial Tr. Vol. III, 32-33, July 19, 2002.)

The Federal Court of Appeals for the Sixth Circuit has said that

[a] prosecutor may not imply that an accused's decision to meet with counsel . . . implies guilt.  Neither may she suggest to the jury that a defendant hires an attorney in order to generate an alibi, 'take[ ] care of everything' or 'get ... [his] story straight.'  Such statements strike at the core of the right to counsel, and must

26

not be permitted.

*Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir. 1990) (citing *United States v. McDonald*, 620 F.2d 559, 564 (5th Cir. 1980), and *United States ex rel. Macon v. Yeager*, (3d Cir. 1973)).  Thus, the prosecutor's intentional and repeated questions suggesting that Petitioner had concocted his testimony after consulting his attorney was improper.  Nevertheless, evidence of Petitioner's guilt was substantial, and the content of his  conversation with his attorney was never elicited.  In fact, the prosecutor stated that he did not want to know the specifics of their conversation.  (Trial Tr. Vol. III, 33, July 19, 2002.)

The trial court, moreover, pointed out in open court that Petitioner had a right to speak with, and visit, his attorney at any time and that the substance of their conversation was protected by the attorney-client privilege.  (*Id*. at 32-34.)  At the conclusion of the case, the trial court instructed the jurors that the attorneys' questions and statements were not evidence and that the jurors should base their verdict only on the properly admitted evidence.  (*Id*. at 67, 69.)  "[J]uries are presumed to follow their instructions."  *Richardson v. Marsh*, 481 U.S. 200,  211 (1987).

The Court concludes for the reasons given above that the prosecutor's improper remarks could not have a "substantial and injurious effect or influence" on the jury's verdict and were harmless.  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  Petitioner therefore has no right to relief on the basis of the prosecutor's reference to Petitioner's overnight consultation with his attorney.

**E.  Appellate Counsel**

Petitioner claims that his appellate attorney was ineffective for failing to raise the previous four claims on appeal.  Petitioner asserts that appellate counsel's failure to raise

27

meritorious claims on appeal constituted deficient performance and that the deficient

performance prejudiced his chances of a different outcome on appeal.  The trial court's successor

was the only court to address this claim, and she stated that Petitioner's claim of ineffective

assistance of appellate counsel lacked merit.

Although an appellate attorney's failure "to raise an issue on appeal can amount to

constitutionally ineffective assistance," *Jalowiec v. Bradshaw*, 657 F.3d 293, 321 (6th Cir.

2011), *cert. denied*,  __ U.S. __, 133 S. Ct. 107 (2012), an attorney is not required to raise every

non-frivolous claim requested by the client on appeal.  *Jones v. Barnes*, 463 U.S. 745, 751

(1983).  To demonstrate that appellate counsel was ineffective, the petitioner must show (1) that

his attorney unreasonably failed to discover and raise nonfrivolous issues on appeal and (2) a

reasonable probability that he would have prevailed on appeal but for his appellate attorney's

failure to raise the issues.  *Smith v. Robbins*,  528 U.S. 259, 285 (2000) (citing *Strickland*, 466

U.S. at 687-91, 694).

Petitioner's claims about trial counsel, the jury instructions, the excluded hearsay

testimony, and the prosecutor  lack merit.  The Court's inquiry, therefore, is at an end.

"Appellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks

merit.'"  *Shaneburger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*,

264 F.3d 663, 676 (6th Cir. 2001)).

**F.  Cumulative Effect of Errors**

Petitioner's sixth and final claim alleges that the combination of trial errors deprived him

of due process and a fair trial.  No state court specifically addressed this claim, but the claim is

not deserving of habeas relief, because "[t]he Supreme Court has not held that distinct

28

constitutional claims can be cumulated to grant habeas relief."  *Lorraine v. Coyle*,  291 F.3d 416, 447 (6th Cir. 2002).  Thus, it cannot be said that the state court orders in this case were contrary to any Supreme Court decision so as to warrant habeas relief under AEDPA.  *See id*. Petitioner's cumulative-error claim, therefore, is not cognizable on habeas corpus review. *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)), *cert. denied sub nom Sheppard v. Robinson*,  __ U.S. __, 132 S. Ct. 2751 (2012).

## IV.  Conclusion

For the reasons given above, Petitioner's claims either are not cognizable on habeas review or they lack merit.  Further, the state post-conviction court's rejection of Petitioner's claims was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts.  Accordingly, the amended habeas corpus petition (Dkt. #41) is **DENIED**.

## V.  Regarding a Certificate of Appealability and the Fee on Appeal

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition.  Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]"  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *see also*

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (stating that, when a district court has rejected the petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong").

Reasonable jurists would not find the Court's assessment of Petitioner's constitutional claims debatable or wrong, nor conclude that the issues are adequate to deserve encouragement to proceed further. The Court therefore declines to grant a certificate of appealability. Nevertheless, if Petitioner chooses to appeal this decision, he may proceed *in forma pauperis* on appeal without further authorization, because he was permitted to proceed without prepayment of the filing fee in this Court, and an appeal could be taken in good faith. Fed. R. App. P. 24(a)(3).


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 30, 2014

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 30, 2014.


s/Deborah Tofil
Case Manager